AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT **FILED**

for the

Eastern District of California

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

AUG 14 2015

In the Matter of the Search of )
)
Electronic Devices described in Attachment A, )
currently located at the FBI Field Office in Sacramento, )
California )
)

Case No.

**2:15 - SW - - 4 3 5    EFB**

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1201, 2312 | Kidnapping & interstate transportation of a stolen vehicle |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested

☐ under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Wesley S. Drone, SA, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __8-14-2015__

_____
*Judge's signature*

City and state:  Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of: | CASE NO. |
| Electronic Devices described in Attachment A, currently located at the FBI Field Office in Sacramento, California | AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH ELECTRONIC DEVICES |

1.      I, Wesley S. Drone, being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices— which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3.      I am a Special Agent with the Federal Bureau of Investigation, and have been since 2011. I am currently assigned to the Sacramento Field Division, where I investigate a variety of criminal violations, including Internet fraud and computer intrusions. I have received extensive specialized training, and developed experience in various criminal investigations involving digital evidence. I have also received training in gathering evidence from Internet and other communication devices.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

1

## II.    IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.    The property to be searched is Devices Described in Attachment A, hereinafter the "Devices." On June 8, 2015, Dublin Police Services of Alameda Sheriff's Department seized all but one of the Devices at 2710 Genoa Avenue in South Lake Tahoe, California. Dublin Police Services securely stored those Devices at their office in Dublin, California and at the San Jose Regional Computer Forensics Laboratory (RCFL). On August 7, 2015, Dublin Police Services released custody of those Devices to agents of the FBI who retrieved them from Dublin Police Services office and the San Jose RCFL and stored them temporarily at the FBI Fairfield Resident Agency. The Devices were transported to the offices of the FBI located at 4500 Orange Grove Avenue, Sacramento, California where they were inventoried and securely stored. On August 7, 2015, agents of the FBI searched a red 2007 Mustang, owned by MATTHEW MULLER, which was recovered from the Reno-Tahoe airport located in Reno, Nevada. During that search, the final Device, the last computer hard drive described in Attachment A, was seized.

## III.    THE APPLIED-FOR WARRANT WOULD AUTHORIZE THE FORENSIC EXAMINATION OF THE DEVICES FOR THE PURPOSE OF SEARCHING AND SEIZING THE ELECTRONICALLY STORED DATA DESCRIBED IN ATTACHMENT B.PROBABLE CAUSE

6.    I have spoken to FBI Special Agent Jason Walter. He advises that the following affidavits are true and I incorporate them herein:

   a)    SA Walter's June 29, 2015 Affidavit in Support of an Application for a Search Warrant and an Arrest Warrant filed in 2:15-MJ-138 CKD, 2:15-SW-375 CKD, and 2:15-SW-376 CKD;

   b)    SA Walter's July 1, 2015 and July 8, 2015 Affidavits in Support of an Application for a Search Warrant filed in 2:15-SW-382 CKD, 2:15-SW-383 CKD, and 2:15-SW-394 CKD.

I will provide a courtesy copy of each of these affidavits to the Court.

7.    The aforementioned Affidavits establish probable cause to believe that Matthew Muller violated 18 U.S.C. § 1201(kidnapping) and 18 U.S.C. § 2312 (interstate transportation of a stolen vehicle). SA Walter's June 29, 2015 Affidavit describes a number of events that lead me to believe that the Devices contain evidence of, or were used in furtherance of, that crime:

a) On March 23, 2015, UNSUB(S) entered the home of VICTIM M and installed a small surveillance/security style camera taped to the ceiling in the family room. UNSUB told VICTIM M he was being monitored. Based on my training and experience, I know that one of the most common ways to monitor a surveillance/security style camera is by use of the Internet and an electronic device. The monitoring of such a camera by use of the Internet and an electronic device controlled by the UNSUB would likely contain evidence in the form of digital forensic artifacts.

b) UNSUB(S) obtained VICTIM M's WELLS FARGO checking account information, CHASE BANK credit card account information, login information for VICTIM M's COMCAST.NET and LIVE.COM email accounts, the password to his WIFI router in the residence, and access to his laptop computer, which was later taken by the UNSUB(S). VICTIM M noticed a new email message on his LIVE.COM account from his COMCAST.NET account demanding two payments of $8,500. Based on my training and experience, I know that when a person accesses a website, such as that of an email provider or financial corporation, the device used would likely contain evidence in the form of digital forensic artifacts.

c) On March 24, 2015, UNSUB(S) sent an email from VICTIM M's LIVE.COM account to HENRY LEE's email, a journalist from the SAN FRANCISCO CHRONICLE newspaper at HLEE@SFCHRONICLE.COM. The above email contained the hyperlink of http://dropcanvas.com/buofr, which is a link to an audio file (that has been "stripped" of all identifying data) that depicts a female voice identifying herself as VICTIM F, describing how she is still alive because she knows of the German airliner that crashed in the French Alps, and that it was in fact her as her first concert she went to was BLINK 182. Email header analysis revealed that the email was sent using the Singapore-based anonymous email service anonymousemail.com. Based on my training and experience, I know that electronic devices are often used to record audio and the device used would likely contain evidence in the form of digital forensic artifacts.

d) UNSUB #2 sexually assaulted VICTIM F and said that he was going to video record the

3

`1  assault. Based on my training and experience, I know that electronic devices are often

2  used to record video and the device used would likely contain evidence in the form of

3  digital forensic artifacts. Additionally, any device used to store or view a video file may

4  also contain digital evidence.

5  e)  On March 28, 2015, UNSUB sent an email to SAN FRANCISCO CHRONICLE

6  Journalist HENRY LEE declaring that the kidnapping was not a hoax. The email

7  contained links to corroborating photos published on the anonymous image hosting site

8  anony.ws. Based on my training and experience, I know that electronic devices are often

9  used to take and store photographs and the device used would likely contain evidence in

10  the form of digital forensic artifacts. Additionally, any device used to view photos may

11  also contain digital evidence.

12  f)  On March 30, 2015, UNSUB(S) sent an email to Public Information Officer Lieutenant

13  Kenny Park of Vallejo Police Department threatening to "attack" him if he does not

14  apologize publicly to VICTIM F for characterizing her kidnapping as "an orchestrated

15  event and not a kidnapping". In the email the UNSUB(S) describes using Spector 360,

16  SniperSpy and another similar program. Based on my training and experience, I know

17  that Spector 360 and SniperSpy are commercially available remote monitoring software

18  products that can be used to spy on individuals. The researching, downloading, storage,

19  or use of remote monitoring software on a device would likely leave evidence in the form

20  digital forensic artifacts.

21  g)  In the aforementioned March 28, 2015 email sent to HENRY LEE, the UNSUB included

22  links to photos of wireless routers and WIFI passwords that were obtained by way of

23  breaking and entering into residences. Based on my training and experience, I know that

24  electronic devices may contain evidence of when and where the device was used.

25  Electronic devices often retain a history of connections to wireless networks. This history

26  may include a specific date and time the device was connected and unique identifiers of

27  the wireless networking hardware connected to. A query of third party databases for these

28  unique identifiers may result in the approximate GPS location of said wireless

4

1    networking hardware. Electronic devices may contain evidence of historical GPS
2    coordinates.

3    h)    Victim M says that the UNSUB(s) carried off Victim M's Asus laptop computer.
4          According to Best Buy records, Victim M had purchased an Asus laptop of the same kind
5          found in Muller's South Lake Tahoe residence.  The South Lake Tahoe Asus U50F
6          Laptop bears serial number 15G29N005500, but the Best Buy record does not indicate
7          the serial number of Victim M's laptop.  Attribution evidence is important beyond Victim
8          M's laptop.  The anonymous emails from the kidnapper(s) described of a long campaign
9          of burglary and theft from residences on Mare Island.  I know that computers and
10         electronic storage media preserve evidence that can be used to attribute their use and/or
11         ownership.

12    8.    Investigation has revealed further evidence that MULLER committed the Vallejo
13    kidnapping.  Search of the storage locker at 2033 Broadway Street, Vallejo, California resulted in the
14    seizure of 4 aerial drones and a wireless video camera and receiver.  The anonymous emails from the
15    kidnapper(s) described use of at least one aerial drone.  Two of the seized drones had cameras capable of
16    capturing photos and recording videos.  One of the seized drones had the ability to be controlled by an
17    electronic device, such as a smart phone or computer, to include streaming video recorded by the drone
18    to the electronic device.  Based on my training and experience, I know that electronic devices may
19    contain digital evidence in the form of photos, videos, and GPS coordinates recorded by a drone.

20    9.    A parking receipt found in the stolen 2011 White Ford Mustang indicated parking at the
21    Las Vegas airport between 3/25/2015 00:01 a.m. and 4/29/2015 12:44 p.m.  The parking receipt was
22    paid with a Visa card bearing the last four digits 4668 and in the name of Matthew D. Muller.  Victim F
23    was released in Southern California on 3/25/2015 at approximately 9:45 a.m. Additional investigation
24    revealed that the time of entry, 00:01, into the Las Vegas airport parking facility was manually entered
25    on 4/29/2015 by a Las Vegas airport parking cashier. Las Vegas airport policy dictates that when a
26    customer does not provide a ticket indicating the date and time of entry, the parking cashier identifies
27    the first day the vehicle was parked based on a manual facility inventory report and enters that date with
28    the time of 00:01 to charge the customer for the entire day.  The precise time the 2011 White Ford

'1  Mustang entered the Las Vegas Airport parking facility on 3/25/2015 is unknown. The same vehicle's

2  navigation history reflects the user searching for the Huntington Beach location where Victim F was

3  released. Records related to location, payment, parking, and travel are material to resolving where

4  Muller and his stolen car were.

5      10.    The FBI is aware of other suspicious activity that may tend to help establish MULLER's

6  modus operandi and address any insanity defense:

7      a)    **Palo Alto suspicious person incident # 092680001**

8            On 9/25/2009, at 12:04am, a citizen reported a suspicious person emerging from the rear

9            of one apartment building and entering the rear of a second apartment building. Officer

10           Parham responded and contacted Matthew Muller walking in the area. Matthew Muller

11           provided identification and explained that he was a visiting professor from Harvard

12           University and was teaching at Stanford University. Follow-up investigation was

13           conducted and Matthew Muller was not associated with, or teaching at, Stanford

14           University. The Palo Alto police department found this incident while researching

15           suspicious calls in the area where there was an attempted sexual assault on below

16           10/18/2009 (described below).

17     b)    **Mountain View false imprisonment with violence case # 09007343**

18           On 9/29/2009, at approximately 5:00am, a 27 year old female victim was sleeping alone

19           in her apartment. The victim woke up to an unknown man on her back, and she began to

20           scream. The man told the victim to stop screaming, calm down, this was a robbery, he

21           was there for identity theft purposes, and he needed to wire money offshore for

22           fraudulent activity. The suspect was wearing tight fitting, all black clothing; and a black

23           cotton ski mask, with cut outs for the eyes and mouth. The victim believed he was a

24           white male, approximately six feet tall, slender build, and described him as polite. The

25           suspect handcuffed the victim's hands and used Velcro to bind her feet. At one point, the

26           suspect placed a mask, or swim goggles, over the victim's eyes. She explained that the

27           item fit like swim goggles, and when the suspect placed the goggles on her, the rubber

28           strap got caught in her hair. The goggles were blacked out, but the victim could see a

6

1  little out the sides as if the goggles had a piece of cardboard over them. The victim swam

2  approximately four times a week, and was familiar with swim goggles. The suspect

3  made the victim drink a small amount of unknown liquid that the victim thought was

4  NyQuil. She estimated the amount she drank was similar to a small energy drink that

5  could be purchased at a convenience store, or 7-11. During the incident she felt

6  disoriented, confused and surreal; as if it was a dream. The suspect asked the victim

7  questions such as her name, date of birth, social security number, mother's maiden name,

8  how long she lived at the residence, prior addresses, and when her parents passed away.

9  The suspect asked the victim technical questions about her computer, asked if her D.S.L.

10  was dynamic or static, and attempted to access her computer. During the incident, the

11  suspect retrieved the victim's cell phone, scrolled through the contacts, and asked the

12  victim who each person was. The suspect asked the victim what time she went to work.

13  He then sent a text message to the victim's boss and told him the victim was sick.

14  Periodically throughout the incident, the victim heard the suspect talking, as if to another

15  person. However, she never saw a second person, nor heard a second voice. The suspect

16  threatened to rape the victim. The victim asked him to use a condom, and pleaded with

17  him several times not to rape her. The suspect did not rape the victim. The incident

18  lasted approximately two hours. The victim's neighbor was awake during the incident

19  and noticed what appeared to be a small flashlight moving around inside the victim's

20  apartment. However, the neighbor assumed it was the resident of the house and did not

21  take any action.

22  c)  **Palo Alto sexual assault attempt rape case # 09-5866**

23  On 10/18/2009, at approximately 3:30am, a 32 year old female victim was sleeping alone

24  in her apartment. The victim was a Harvard University student, studying at Stanford

25  University. The victim woke up when an unknown man came into her room, jumped on

26  top of her, straddled her, told her this was a robbery, and was there for information. The

27  suspect was wearing tight fitting, all black, spandex-type clothing; a black garment over

28  his head; and black gloves. The victim believed he was a white male, mid-20's, with

7

short hair, between 6' and 6'2" tall, with a muscular build. The suspect restrained the victim's arms behind her back and tied her ankles together using Velcro. He placed ear plugs into the victim's ears, and used surgical tape to cover the victim's eyes. The suspect gave the victim three options: to be given NyQuil, stunned with a stun gun, or be injected with "A-Bomb." The victim pleaded with the suspect to give her NyQuil. The suspect asked the victim if she was allergic to anything and then read the ingredients to the victim. After confirming the victim was not allergic to any of the ingredients, the suspect poured an unknown about of NyQuil directly into the victim's mouth. The suspect asked the victim questions such as her log in PIN numbers for her Harvard and Stanford accounts, her email address and password, prior addresses, previous travel locations, if she was on a TSA hold, her parents' names, parents' phone numbers, parents' birthdays, parents' social security numbers, parents' addresses, sister's address, sister's phone. The victim believed the suspect was asking these questions to make some kind of online overseas transactions. Periodically throughout the incident, the victim heard the suspect whispering and talking to another person. At one point the victim saw a silhouette of another person, but she never saw a second person, nor heard a second voice. The suspect attempted to rape the victim and the victim began to fight with the suspect. During the fight, the suspect threatened to inject the victim with Ketamine. When the victim told the suspect she had previously been raped, the suspect stopped attempting to rape her. Further investigation revealed that on February 6, 2008, the victim had attended an event at Harvard University that was organized by Matt Muller. The event was titled, "A Lens Into a Humanitarian Emergency and the Role of States and Human Rights Activists."

On October 23, 2009, a detective investigating this incident left his business card at Muller's residence. Two days later, he received a call back from Muller and asked Muller to come to the station for an interview. According to the detective's report, "Muller said he knew what it was about as he had read the story about the college terrace incident. He told me he would cooperate with anything I needed and agreed to meet with

'1    me." Subsequently, Muller's attorney contacted the detective and advised that Muller

2    would not be meeting with the police. Based on a failed log-in attempt to the victim's

3    email, police obtained a search warrant for a location not associated with Muller. The

4    occupant agreed to a DNA swab and he was eventually eliminated as a suspect.

5    d)    **Menlo Park missing person case # 09-3021**

6    On 11/13/2009, Matthew Muller's then-wife, also an attorney, reported Matthew Muller

7    missing. Matthew Muller left a note stored electronically on a USB drive. The note said,

8    among other things, "I am going completely off the grid – no phone, email, credit cards,

9    etc., so please do not try to track me as it will only draw attention. Any commotion at the

10    apartment is also not likely to go unnoticed." Muller promised that she would receive an

11    automated email later. When it arrived, the email to Muller's wife and family, stated,

12    among other things, "I have problems beyond my mental health." He further stated, "I

13    live in terror most of the time and can't keep up appearances any longer, and this is

14    perhaps the least extreme thing I can do to resolve it that does not also expose everybody

15    to criminal liability. I really don't know what else to do. I am up against people who,

16    although they may be acting to achieve just ends, seem to believe that any available

17    means are justified." Muller wrote, "If they want to investigate me, subpoena me, arrest

18    me, then fine, I will cooperate fully. But this sort of psychological warfare is wrong,

19    whatever their reasons." Muller said, "I will stay safe. For what it's worth, I think now I

20    will get better and be able to sleep knowing that I won't be pulled out of bed at any

21    moment." Two days later Muller called his then-wife from Utah, and she picked him up.

22    e)    **Palo Alto sexual assault attempt rape case # 12-6271**

23    On 11/29/2012, at approximately 2:20am, a 26 year old female victim was sleeping alone

24    in her apartment. The victim woke up and saw a shadow at the foot of her bed. The

25    suspect jumped on top of her and told her to shut up. The victim screamed loudly a

26    number of times and began to fight with the suspect. After a struggle, the suspect got off

27    of the victim and ran out of the house. The suspect was wearing a dark hooded sweatshirt,

28    dark pants, gloves, and an unknown type of material over his head. The victim estimated

the suspect was between 5' and 6' tall. The victim's computer was downstairs and had been moved to a different location than where the victim left it prior to going bed. Two "bump keys" were left at the scene, near the front door. These keys are a type of master key that is designed to open all locks of a specific manufacturer. The detective investigating the 2012 break-in noted that in 2009 Muller's DNA was tested and it did not match DNA recovered at the scene at one of the 2009 break-ins. The detective also noted that the 2009 suspect had told a victim that he was leaving evidence to mislead law enforcement.

11.     On or about July 17, 2015, Juliette Goodrich, a journalist with KPXI CBS San Francisco, interviewed Matthew Muller at the Santa Rita Jail in Dublin, California. According to the article published by Goodrich, she was not allowed to record the interview or take notes and her account came from notes she wrote down immediately following the interview. According to Goodrich's broadcast report, Muller told Goodrich, "I want to focus on the victims…I do feel very bad for Denise and other victims out there." The jail recorded Muller's conversation with Goodrich. Detective Campos of Dublin Services spoke with the jail Classification Unit, which told him that the public is warned of this recording and inmates are informed in the inmate handbook that each receives on intake. In the conversation, Muller said a number of things "off the record and on background." He said that the anonymous emails were sent because Vallejo Police had said that Victim F's account was untrue. He said that he had a psychotic break in 2009 (the year that the Palo Alto and Mountain View events occurred). He said ascribed his conduct to mental illness, a belief in some kind of conspiracy, and some kind of supposed side effect from a vaccine. He said that victim of the Dublin break in was not random. In the context of discussing the kidnapping of Victim F "off the record and on background," Muller said that there was no gang and that it was just him.

12.     The fact that MULLER knew facts about his victims indicates that he probably conducted online research of his targets. These recurring crimes involving nighttime home intrusions in which passwords are demanded indicates some plan for further use of computers and/or the Internet for crime. Any data on the Devices that can show location will be material to show MULLER's location at the time of crime(s) and also indicate whether he traveled across state lines during the time when the 2011

10

1     Mustang was a stolen vehicle. Money transactional records can help show Muller's location and also

2     indicate whether he purchased any of the distinctive instrumentalities of the offenses such as drones,

3     swim goggles, or wireless cameras and whether he had a financial motive to commit the Vallejo

4     kidnapping for which a ransom demand was made.

5          13.    The anonymous emails also indicate that the sender knew, or thought he knew, something

6     about law enforcement investigative techniques. One common way that the sender could have learned

7     of such things is through Internet research. Such research would leave digital artifacts on the computer

8     used to do it.

9                           **IV.**    **TECHNICAL TERMS**

10          14.    Based on my training and experience, I use the following technical terms to convey the

11     following meanings:

12         a)    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is

13             a handheld wireless device used for voice and data communication through radio signals.

14             These telephones send signals through networks of transmitter/receivers, enabling

15             communication with other wireless telephones or traditional "land line" telephones. A

16             wireless telephone usually contains a "call log," which records the telephone number,

17             date, and time of calls made to and from the phone. In addition to enabling voice

18             communications, wireless telephones offer a broad range of capabilities. These

19             capabilities include: storing names and phone numbers in electronic "address books;"

20             sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

21             storing still photographs and moving video; storing and playing back audio files; storing

22             dates, appointments, and other information on personal calendars; and accessing and

23             downloading information from the Internet. Wireless telephones may also include global

24             positioning system ("GPS") technology for determining the location of the device.

25         b)    GPS: A GPS navigation device uses the Global Positioning System to display its current

26             location. It often contains records the locations where it has been. Some GPS navigation

27             devices can give a user driving or walking directions to another location. These devices

28             can contain records of the addresses or locations involved in such navigation. The Global

1     Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites

2     orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite

3     repeatedly transmits by radio a mathematical representation of the current time, combined

4     with a special sequence of numbers. These signals are sent by radio, using specifications

5     that are publicly available. A GPS antenna on Earth can receive those signals. When a

6     GPS antenna receives signals from at least four satellites, a computer connected to that

7     antenna can mathematically calculate the antenna's latitude, longitude, and sometimes

8     altitude with a high level of precision.

9     c)     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric

10     address used by computers on the Internet. An IP address is a series of four numbers,

11     each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer

12     attached to the Internet computer must be assigned an IP address so that Internet traffic

13     sent from and directed to that computer may be directed properly from its source to its

14     destination. Most Internet service providers control a range of IP addresses. Some

15     computers have static-that is, long-term-IP addresses, while other computers have

16     dynamic-that is, frequently changed-IP addresses.

17     d)     Internet: The Internet is a global network of computers and other electronic devices that

18     communicate with each other. Due to the structure of the Internet, connections between

19     devices on the Internet often cross state and international borders, even when the devices

20     communicating with each other are in the same state.

21     e)     TOR: The Onion Router (TOR) network is a group of volunteer-operated servers that

22     allows people to improve their privacy and security on the Internet. Tor's users employ

23     this network by connecting through a series of virtual tunnels rather than making a direct

24     connection, thus allowing both organizations and individuals to share information over

25     public networks (i.e. Internet) without compromising privacy. The Tor network hides a

26     users true IP Address and therefore physical location.

27     15.     Based on my training, experience, and research, I know that some of the Devices have

28     capabilities that allow them to serve as a wireless telephone, camera, video and audio recorder, GPS

12

1 navigation device and internet access device. In my training and experience, examining data stored on

2 devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or

3 used the device.

4          **V.**    **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

5     16.     Based on my knowledge, training, and experience, I know that electronic devices can

6 store information for long periods of time. Similarly, things that have been viewed via the Internet are

7 typically stored for some period of time on the device. This information can sometimes be recovered

8 with forensics tools.

9     17.     There is probable cause to believe that things that were once stored on the Device may

10 still be stored there, for at least the following reasons:

11     a)     Based on my knowledge, training, and experience, I know that computer files or

12             remnants of such files can be recovered months or even years after they have been

13             downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files

14             downloaded to a storage medium can be stored for years at little or no cost. Even when

15             files have been deleted, they can be recovered months or years later using forensic tools.

16             This is so because when a person "deletes" a file on a computer, the data contained in the

17             file does not actually disappear; rather, that data remains on the storage medium until it is

18             overwritten by new data.

19     b)     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

20             space-that is, in space on the storage medium that is not currently being used by an active

21             file-for long periods of time before they are overwritten. In addition, a computer's

22             operating system may also keep a record of deleted data in a "swap" or "recovery" file.

23     c)     Wholly apart from user-generated files, computer storage media-in particular, computers'

24             internal hard drives-contain electronic evidence of how a computer has been used, what it

25             has been used for, and who has used it. To give a few examples, this forensic evidence

26             can take the form of operating system configurations, artifacts from operating system or

27             application operation, file system data structures, and virtual memory "swap" or paging

28             files. Computer users typically do not erase or delete this evidence, because special

1  software is typically required for that task. However, it is technically possible to delete
2  this information.

3  d)  Similarly, files that have been viewed via the Internet are sometimes automatically
4  downloaded into a temporary Internet directory or "cache."

5  18.  Forensic evidence. As further described in Attachment B, this application seeks
6  permission to locate not only electronically stored information that might serve as direct evidence of the
7  crimes described on the warrant, but also forensic evidence that establishes how the Device was used,
8  the purpose of its use, who used it, and when. There is probable cause to believe that this forensic
9  electronic evidence might be on the Device because:

10  a)  Data on the storage medium can provide evidence of a file that was once on the storage
11  medium but has since been deleted or edited, or of a deleted portion of a file (such as a
12  paragraph that has been deleted from a word processing file). Virtual memory paging
13  systems can leave traces of information on the storage medium that show what tasks and
14  processes were recently active. Web browsers, e-mail programs, and chat programs store
15  configuration information on the storage medium that can reveal information such as
16  online nicknames and passwords. Operating systems can record additional information,
17  such as the attachment of peripherals, the attachment of USB flash storage devices or
18  other external storage media, and the times the computer was in use. Computer file
19  systems can record information about the dates files were created and the sequence in
20  which they were created.

21  b)  Forensic evidence on a device can also indicate who has used or controlled the device.
22  This "user attribution" evidence is analogous to the search for "indicia of occupancy"
23  while executing a search warrant at a residence.

24  c)  A person with appropriate familiarity with how an electronic device works may, after
25  examining this forensic evidence in its proper context, be able to draw conclusions about
26  how electronic devices were used, the purpose of their use, who used them, and when.

27  d)  The process of identifying the exact electronically stored information on a storage
28  medium that are necessary to draw an accurate conclusion is a dynamic process.

14

1    Electronic evidence is not always data that can be merely reviewed by a review team and

2    passed along to investigators.  Whether data stored on a computer is evidence may

3    depend on other information stored on the computer and the application of knowledge

4    about how a computer behaves.  Therefore, contextual information necessary to

5    understand other evidence also falls within the scope of the warrant.

6  e)  Further, in finding evidence of how a device was used, the purpose of its use, who used

7    it, and when, sometimes it is necessary to establish that a particular thing is not present on

8    a storage medium.

9  19.  Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

10 warrant I am applying for would permit the examination of the device consistent with the warrant.  The

11 examination may require authorities to employ techniques, including but not limited to imaging

12 (duplication) of the entire medium and computer-assisted scans of the entire medium, that might expose

13 many parts of the device to human inspection in order to determine whether it is evidence described by

14 the warrant.

15 //

16 //

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28 //

1    20.    <u>Manner of execution.</u>  Because this warrant seeks only permission to examine a device

2  already in law enforcement's possession, the execution of this warrant does not involve the physical

3  intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize

4  execution of the warrant at any time in the day or night.

**VI.    <u>CONCLUSION</u>**

6    21.    I submit that this affidavit supports probable cause for a search warrant authorizing the

7  examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Wesley S. Drone
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on:    8-14-2015

The Honorable Edmund F. Brennan
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA MATTHEW D. SEGAL

16

## ATTACHMENT A

The following property hereinafter referred to as Devices:

Seized by Dublin Police Services from 2710 Genoa Avenue in South Lake Tahoe, California
1. Acer Netbook, Model T77H462, S/N: WOI101304E436B97377211
2. Acer Netbook, Model T77H462, S/N: WOI101304E436B973A7211
3. Lenovo Yoga 2 Pro Laptop, S/N: YB04740312
4. Asus U50F Laptop, S/N: 9CN0AS112103500
5. IBM Travelstar 2.5" (laptop size) 20 GB hard drives, S/N: TH-04C449-12567-17C-CZGW
6. Western Digital My Passport external USB hard drive, S/N: WXK1E32ANYSH
7. Samsung Galaxy Note 4 Cellphone, IMEI: 990004824579217
   a. SIM card within the cellphone, S/N: 89148000001685943754
8. LG TracFone, Model: LGL34C, FCC ID: ZNFL34C, S/N: 412CQSF2045454
9. Apple iPhone 6, Model: A1549, FCC ID: BCG-E2816A, IMEI : 354407068131944
10. 1gb Generic Flash Disk USB Device, labeled "Think Tank Learning"

Seized by the FBI from red 2007 Mustang
1. Inateck 2.5" Data HDD, External Enclosure Hard Drive, FEU3NS-1E

All Devices are currently located at:

FBI Field Office
4500 Orange Grove Ave
Sacramento, CA

This warrant authorizes the forensic examination of the Devices for the purpose of

identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 1201 and 2312, including:

a. Any and all documents, materials and other forensically recoverable digital artifacts concerning the preparation, planning, execution, description, and concealing of a kidnapping or home invasion robbery.

b. Internet browsing history related to the purchase or use of drugs for sedation, the use of remote monitoring tools, online research for victim names and addresses to include driving directions, the use of anonymous email services, the use of online anonymity software such as The Onion Router (TOR), the research and purchase of tools used for breaking and entering residences or vehicles.

c. Historical wireless network connections and GPS coordinates.

d. The use of remote monitoring tools, programs, codes, or commands.

e. Photographs, audio or video recordings of kidnapping victims.

f. Any and all documents or information relating to any email accounts accessed by the device.

g. Any data related to any email sent in the name of Aaron Quinn or anonymously.

h. Any and all documents or information relating to any communications or correspondence with victims, journalists, and/or law enforcement.

i. Any and all data related to supposed government conspiracy theories.

j. Any and all data related to vaccine side effects, Gulf War Syndrome.

k. Address books, appointment books, calendars, and schedules, including any information recording travel or meetings for the time period January 2009 to the present.

l. Phone bills or phone records for the time period January 2009 to the present.

m. All bank records, checks, credit card bills, account information, and other financial and/or purchase records for the time period January 2009 to the present.

n. Data related to law enforcement techniques.

o. Evidence of user attribution showing who used or owned the computers or electronic storage devices at the time the things described in this warrant were

created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

p. Any data related to Denise Huskins, Aaron Quinn, Henry Lee, Kenny Park, Andrea Roberts, Vallejo Police Department, or the FBI.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

q. Any data recorded by an aerial drone. wsd

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | Case No. |
| Electronic Devices described in Attachment A, currently located ) at the FBI Field Office in Sacramento, California ) | |
| ) | **2:15 - SW - - 4 3 5   EFB** |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 28, 2015 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐     for _____ days *(not to exceed 30)*  ☐  until, the facts justifying, the later specific date of _____.

Date and time issued:     *8-14-2015*                              _____
                                                                                                                          *Judge's signature*

City and state:     Sacramento, California                    ___Edmund F. Brennan, U.S. Magistrate Judge___
                                                                                                              *Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                              Date

## ATTACHMENT A

The following property hereinafter referred to as Devices:

Seized by Dublin Police Services from 2710 Genoa Avenue in South Lake Tahoe, California
1. Acer Netbook, Model T77H462, S/N: WOI101304E436B97377211
2. Acer Netbook, Model T77H462, S/N: WOI101304E436B973A7211
3. Lenovo Yoga 2 Pro Laptop, S/N: YB04740312
4. Asus U50F Laptop, S/N: 9CN0AS112103500
5. IBM Travelstar 2.5" (laptop size) 20 GB hard drives, S/N: TH-04C449-12567-17C-CZGW
6. Western Digital My Passport external USB hard drive, S/N: WXK1E32ANYSH
7. Samsung Galaxy Note 4 Cellphone, IMEI: 990004824579217
   a. SIM card within the cellphone, S/N: 89148000001685943754
8. LG TracFone, Model: LGL34C, FCC ID: ZNFL34C, S/N: 412CQSF2045454
9. Apple iPhone 6, Model: A1549, FCC ID: BCG-E2816A, IMEI : 354407068131944
10. 1gb Generic Flash Disk USB Device, labeled "Think Tank Learning"

Seized by the FBI from red 2007 Mustang
1. Inateck 2.5" Data HDD, External Enclosure Hard Drive, FEU3NS-1E


All Devices are currently located at:

FBI Field Office
4500 Orange Grove Ave
Sacramento, CA

This warrant authorizes the forensic examination of the Devices for the purpose of

identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Devices described in Attachment A that relate to violations of 18
U.S.C. §§ 1201 and 2312, including:

a.  Any and all documents, materials and other forensically recoverable digital
artifacts concerning the preparation, planning, execution, description, and
concealing of a kidnapping or home invasion robbery.

b.  Internet browsing history related to the purchase or use of drugs for sedation, the
use of remote monitoring tools, online research for victim names and addresses to
include driving directions, the use of anonymous email services, the use of online
anonymity software such as The Onion Router (TOR), the research and purchase
of tools used for breaking and entering residences or vehicles.

c.  Historical wireless network connections and GPS coordinates.

d.  The use of remote monitoring tools, programs, codes, or commands.

e.  Photographs, audio or video recordings of kidnapping victims.

f.  Any and all documents or information relating to any email accounts accessed by
the device.

g.  Any data related to any email sent in the name of Aaron Quinn or anonymously.

h.  Any and all documents or information relating to any communications or
correspondence with victims, journalists, and/or law enforcement.

i.  Any and all data related to supposed government conspiracy theories.

j.  Any and all data related to vaccine side effects, Gulf War Syndrome.

k.  Address books, appointment books, calendars, and schedules, including any
information recording travel or meetings for the time period January 2009 to the
present.

l.  Phone bills or phone records for the time period January 2009 to the present.

m.  All bank records, checks, credit card bills, account information, and other
financial and/or purchase records for the time period January 2009 to the present.

n.  Data related to law enforcement techniques.

o.  Evidence of user attribution showing who used or owned the computers or
electronic storage devices at the time the things described in this warrant were

created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

p. Any data related to Denise Huskins, Aaron Quinn, Henry Lee, Kenny Park, Andrea Roberts, Vallejo Police Department, or the FBI.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

q. Any data recorded by an aerial drone. *usd*